**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**GRETA MALONEY,**

        **Plaintiff,**

                                  **Civil Action 2:20-cv-3265**
                                  **Judge Edmund A. Sargus, Jr.**
    **v.**                             **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL
SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

        Plaintiff, Greta Maloney, brings this action under 42 U.S.C. § 405(g) for review of a final

decision of the Commissioner of Social Security ("Commissioner") denying her application for

social security disability insurance benefits.  This matter is before the United States Magistrate

Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 7), the

Commissioner's Memorandum in Opposition (ECF No. 9), and the administrative record (ECF

No. 6).  For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the

Commissioner of Social Security's nondisability finding and **REMAND** this case to the

Commissioner and the ALJ under Sentence Four of § 405(g).

## I.    BACKGROUND

        Plaintiff, a veteran of the United States Navy, filed her application for benefits on

December 15, 2016, alleging that she has been disabled since July 12, 2016, due to gastroparesis,

slow transient bowel, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity

disorder ("ADHD"), and depression.  (R. at 213-19, 256.)  Plaintiff's application was denied

initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative

law judge ("ALJ").  On December 13, 2018, ALJ Patricia S. McKay (the "ALJ") held a video

hearing at which Plaintiff, represented by counsel, appeared and testified.  (R. at 70-93.)  A

vocational expert also testified.  (R. at 93-101.)  On March 6, 2019, the ALJ issued a decision

finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 7-

29).   On April 20, 2020, the Appeals Council denied Plaintiff's request for review and adopted

the ALJ's decision as the Commissioner's final decision.  (R. at 1-6.)  Plaintiff then timely

commenced the instant action.

## II.   HEARING TESTIMONY

Plaintiff testified at the administrative hearing that lives in a two-story house and can

sweep the bedroom floor, and if she is "feeling okay," can do "a little laundry, do a load of

dishes," and take care of her dogs.  (R. at 71.)  She stated, however, that her activities are usually

limited to about ten minutes, after which she experiences nausea, bloating, cramping, diarrhea,

and vomiting.  (*Id.*)  Plaintiff testified that her stomach and colon "only work at about 20

percent," which causes her other symptoms.  (R. at 72.)  When asked how her gastroparesis

affects her, she replied:

> When I eat food, I have to be very careful that it's not something spicy, or have any
> grease in it.  So if I successfully eat something that does not make me sick
> immediately, within two to four hours I usually start to get sick. And when I get
> sick, I throw up.  Different things in my mouth, I -- my stomach bloats, and I cramp
> excessively, to what I would compare the stages of labor before a baby's head
> crowns.  My lower back, my lower back gets very painful.

(*Id.*)  She testified that every time she eats, she gets nauseous and vomits within a few hours.  (R.

at 73.)  Plaintiff testified that she has had this problem since July 2014, and that when she was

working, it got to the point where she would be unable to be at her desk for more than 10 or 20

minutes at a time before it became too painful for her to sit at her desk. (R. at 73-74.) Plaintiff testified that there had been some improvement from the medication she was on through a clinical trial, but that she has since plateaued with that medication. (R. at 75-76.)

Plaintiff estimated that she could stand or walk for about ten minutes "before all the cramping starts." (R. at 76-77.) Plaintiff testified that she experiences low back pain and cramping/pain in her lower legs, and estimated she could sit for approximately 10-15 minutes before experiencing pain in her shoulders and lower back (stemming from a broken tail bone that never healed). (R. at 77-78.) Plaintiff testified that she usually spends a good portion of her day lying in bed. (R. at 82.) Plaintiff also testified to suffering from PTSD and depression, and stated that she has struggled with a "will to live . . . since 2014, maybe 2015." (R. at 79.) She continued, "I couldn't use the same coping skills anymore," and had to stop taking all other medication that helped her mental health due to the clinical trial. (*Id.*) Plaintiff testified that the "biggest thing" that would keep her from working is that she would have to run to the bathroom every ten minutes, from anywhere from two to six hours on any given day. (R. at 81.) Plaintiff also testified that she has a difficult time dealing with people. (*Id.*)

### III.    RELEVANT MEDICAL RECORDS AND OPINIONS

### A.    Patricia Haynes, M.D.

Plaintiff has treated with her primary care physician, Dr. Patricia Haynes at the Veterans Administration ("VA"), since at least November 8, 2016. (R. at 455.) On December 5, 2016, Plaintiff saw Dr. Haynes for follow up from an urgent care visit the previous day due to abdominal pain, and Dr. Haynes assessed Gastroparesis, ADHD and complex PTSD. (R. at 458-59.) On March 22, 2017, Dr. Haynes prescribed Plaintiff a "5yr handicap placard" for parking, noting that Plaintiff could not walk more than fifty feet without stopping due to her chronic

condition.  (R. at 577.)  Separately, also on March 22, 2017, another doctor at the VA, Dr. Karen Hill, completed a form entitled, "Examination for Household Status or Permanent Need for Regular Aid and Attendance,"[1] indicating that Plaintiff could feed herself, manage finances, administer her medications, and sometimes complete her personal care.  (R. at 578-579.)  Dr. Hill also indicated that Plaintiff needed assistance with preparing meals, bathing, and personal care, and that Plaintiff had difficulty with ambulation.  (*Id.*)

Dr. Haynes saw Plaintiff on November 14, 2017 for an annual outpatient clinical assessment.  (R. at 1055-1057.)  Plaintiff reported that as to her Gastroparesis, she had started on new a medicine Trulance, used to treat irritable bowel syndrome, and was now going to bathroom 8 to 10 times, but was still in the clinical trial.  (R. at 1055.)  Plaintiff reported "this disease is taking control over her, and [her] mood is not good."  (*Id.*)  Plaintiff reported that she had stopped walking, and that because of her stomach, she was unable to lay on it for chiropractic alignment.  (*Id.*)  As to her ADHD, Plaintiff reported that she was being followed by the Mental Health department and felt stable.  (*Id.*)  Dr. Haynes ordered an x-ray of Plaintiff's lumbar spine, which revealed disc space narrowing at L5-S1, and x-ray of her right hip, which was negative.  (R. at 759-60.)  On December 6, 2018, Dr. Haynes completed a Physical Exertion form, opining that Plaintiff was limited to less than a full range of sedentary work.  (R. at 1244.)

**B.**   **Michael Cline, D.O.**

Plaintiff began treating with her gastroenterologist, Dr. Michael Cline at the Cleveland Clinic, in February 2016 for consultation of her gastroparesis.  (R. at 413-16.)   Testing in his office was consistent with gastroparesis and intestinal dysmotility.  (R. at 407-13.)  In June 2016, Dr. Cline prescribed the antibiotic medication Erythromycin, which Plaintiff reported somewhat

---

[1] As discussed below, the ALJ incorrectly attributes this opinion to Dr. Haynes.  (R. at 16-17.)

controlled her symptoms, but she still had some flares of abdominal pain as well as distention and nausea. (R. at 407-10.) In August 2016, Plaintiff began a clinical trial of Propulsid, a drug aimed at increasing motility in the upper gastrointestinal tract. (R. at 401-07.) On May 3, 2017, Dr. Cline certified that Plaintiff was on Propulsid through a compassionate care program via the FDA, and noted that if her drug trial was not effective, she would most likely be evaluated for an intestinal transplant. (R. at 698.) On June 20, 2017, when seen for her nine-month study follow-up, Plaintiff reported significant hunger, gas, and bloating as well as ongoing daily pain, but Dr. Cline noted that Plaintiff was "do[ing] well on the Propulsid." (R. at 1187.) In September 2017, at her twelve-month study follow-up, Plaintiff reported that she still experienced constipation once per week but she had been able to start exercising for 30 minutes at a time. (R. at 1177.)

On September 19, 2018, Dr. Cline reported that Plaintiff suffered from daily nausea and vomiting, diarrhea, and constipation. (R. at 725-26.) He opined that Plaintiff could sit, stand, or walk for one hour each during an eight-hour workday; could not lift more than ten pounds; could not bend, stoop, climb, or squat; but could occasionally reach above her shoulder, and could drive. (*Id.*) Dr. Cline wrote that he did not expect Plaintiff's condition to improve in the future, opined that she had reached maximum medical improvement, and suggested that Plaintiff seek pain management. (*Id.*)

## C.     Jenna Plumb-Sisson, Ph.D.

On September 2, 2018, Plaintiff was evaluated by her psychologist, Dr. Jenna Plumb-Sisson at the VA. (R. at 873.) Dr. Plumb-Sisson noted that Plaintiff engaged in pain-related behaviors throughout the session, such as shifting her weight, sighing, and standing periodically. (*Id.*) Plaintiff reported feeling anxious and overwhelmed while completing her paperwork, and that she had "chronic thoughts about how her family would benefit if she were no longer alive."

(R. at 874.) Her testing revealed a GAD-7 (General Anxiety Disorder test) score of 19 and a PHQ-9 depression scale score of 26. (R. at 877.) Plaintiff returned on September 26, 2018, but was unable to complete that evaluation stating that she was "miserable." (R. at 859.) Dr. Plumb-Sisson determined that Plaintiff was in need of coping skills development rather than further evaluation. (*Id.*) Plaintiff returned on October 18, 2018 and reported significant pain levels. (R. at 841-45.) She again engaged in pain related behaviors such as sighing, grimacing, holding her stomach, shifting her weight, and shifting pillows. (*Id.*) She had to stand partway through the eighty-nine (89) minute appointment, complaining that her stomach pain was similar to childbirth. (*Id.*) Dr. Plumb-Sisson noted that Plaintiff's "affect was restricted at times and her mood was noted to be anxious and depressed." (*Id.*)

On December 5, 2018, Dr. Plumb-Sisson completed a Mental Impairment Questionnaire. (R. at 1239-43.) Dr. Plumb-Sisson noted that she had been treating Plaintiff on a weekly basis since September 5, 2018, and identified Plaintiff's symptoms as: appetite disturbance with weight change; mood disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interest; feelings of guilt/worthlessness; suicidal ideations (better off dead); social withdrawal or isolation; decreased energy; intrusive recollection of a traumatic event; generalized persistent anxiety; and irritability. (R. at 1239.) Dr. Plumb-Sisson also added that "[m]edical symptoms initiate mental health distress which then often intensifies medical symptoms, creating a vicious cycle with little to no relief." (*Id.*) Dr. Plumb-Sisson stated,

> Veteran consistently displays pain related behaviors in session, often requiring sessions to end early due to physical or emotional discomfort. Some sessions, completing the measures is enough to emotionally exhaust her. History for EMDR generally takes 6-8 hours. I have met with [Plaintiff] for 9+ hours and have been able to acquire approximately half of the information needed to proceed.

(*Id.*) Dr. Plumb-Sisson stated that Plaintiff's prognosis was poor without medical improvement, and that her impairment could be expected to last at least twelve months. (R. at 1240.) Dr. Plumb-Sisson found that Plaintiff was extremely limited in the following areas: maintaining attention for two-hour segments, maintaining regular attendance, completing a normal workday/workweek without interruption from her symptoms, and performing at a consistent pace. (R. at 1241.) Dr. Plumb indicated that she could not assess other domains of mental abilities/aptitudes needed to perform work because "any attempt to do so would be speculation," but she opined that Plaintiff's issues moderately interfered with activities of daily living, markedly interfered with social functioning, and frequently interfered with concentration, persistence, and pace resulting in failure to complete tasks in a timely manner. (R. at 1241-42.)

### D.     Phillip Swedberg, M.D.

Plaintiff was examined by a medical consultant, Dr. Phillip Swedberg, for a disability determination on February 3, 2017. (R. at 565-74.) Plaintiff stated that her chief complaint was her stomach, and on examination Dr. Swedberg found that Plaintiff's abdomen was markedly distended, she grimaced as she held her stomach, and her abdomen was somewhat firm with mild tenderness on deep palpation. (R. at 565-66.) Dr. Swedberg noted that Plaintiff exhibited a diminished range of motion to 140 degrees in her right upper extremity, and he found no evidence of spasms and no edema in her extremities. (R. at 566.) Dr. Swedberg diagnosed Plaintiff with a history of global dysmotility syndrome, chronic abdominal pain and constipation, and exogenous obesity. (R. at 568.) Dr Swedberg opined that Plaintiff could perform a mild amount of ambulating, standing, bending, kneeling, pushing, pulling, and lifting and carrying of heavy objects. (*Id.*) He stated that she had some difficulty reaching overhead with her right arm, but had no difficulty grasping and handling objects. (*Id.*)

**E.     Beverly Yamour, M.D.**

In February 27, 2018, Plaintiff underwent an independent medical evaluation with Dr. Beverly Yamour.  (R. at 699-705.)  Plaintiff reported that she was vomiting ten to twenty times per day, and that she experienced cramping, abdominal pain that interfered with walking, severe constipation, and frequent nausea.  (R. at 699.)  On examination, Dr. Yamour questioned the reported frequency of Plaintiff's symptoms, stating that the minimal weight loss and good condition of Plaintiff's teeth was inconsistent with vomiting ten to twenty times per day.  (R. at 703.)  Nevertheless, Dr. Yamour diagnosed Plaintiff with gastroparesis, constipation, and anxiety disorder.  (R. at 704.)  Dr. Yamour opined that Plaintiff was capable of performing sedentary work on a part time basis (four hours per day), and that Plaintiff should not drive or deal with electronic information that was not backed up due to the side effects of her medications.  (R. at 705.)  Dr. Yamour suggested that Plaintiff be re-evaluated in six months as she may be significantly improved at that time if she had surgery, and stated that Plaintiff's restrictions were not considered permanent.  (*Id.*)

## IV.     ADMINISTRATIVE DECISION

On March 6, 2019, the ALJ issued her decision.  (R. at 10-24.)  The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2021.  (R at 13.)  At step one of the sequential evaluation process,[2]  the ALJ found that Plaintiff

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

    1.      Is the claimant engaged in substantial gainful activity?

    2.      Does the claimant suffer from one or more severe impairments?

had not engaged in substantially gainful activity since July 12, 2016, the alleged onset date. (*Id.*)

The ALJ found that Plaintiff had the following severe impairments: a history of delayed gastric emptying/gastroparesis/gastrointestinal dysmotility; degenerative disc disease of the cervical and lumbar spine; degenerative joint disease of the bilateral knees; PTSD; major depressive disorder; and ADHD. (*Id.*) She further found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*) At step four of the sequential process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) with the following limitations:
>
> • Occasional climbing of stairs, crouching, crawling, kneeling, and stooping/bending;
>
> • Avoid workplace hazards such as dangerous, moving machinery and unprotected heights, so claimant is unable to climb ladders, ropes or scaffolds;
>
> • Simple, routine, repetitive work;
>
> • Low stress work, which is work that is self-paced and not at a production rate, and where the job duties are not interdependent with those of co-workers; and
>
> • Occasional contact with supervisors, co-workers and the general public.

---

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

(R. at 14-15.)  In reaching this determination, the ALJ gave "little weight" to the opinions of Drs. Haynes and Cline, finding that their opinions were checkboxes and that the doctors did not provide additional detail with regard to Plaintiff's conditions or resulting limitations.  (R. at 17-18.)  The ALJ also afforded "little weight" to Dr. Plumb-Sisson's evaluation, finding that Dr. Plumb-Sisson did not provide much insight into Plaintiff's functioning ability because it would be "pure speculation."  (R. at 20.)  The ALJ also found that Dr. Plumb-Sisson's report was not consistent with the record as a whole.  (*Id.*)  The ALJ afforded minimal weight to the opinions of consultative examiners, Drs. Swedberg and Yamour, finding that they only examined Plaintiff on one occasion each and given the age and isolated nature of these assessments, the doctors were not in the best position to opine as to the longitudinal effects of Plaintiff's conditions on her functionality.  (R. at 18.)

Relying on the VE's testimony, the ALJ found that Plaintiff is unable to perform her past relevant work as a systems analyst/administrator.  (R. at 22.)  The ALJ determined that Plaintiff could perform a significant number of jobs that exist in the national economy.  (R. at 23.)  She therefore concluded that Plaintiff was not disabled under the Social Security Act since July 12, 2016.  (R. at 24.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.   ANALYSIS

Plaintiff puts forth two assignments of error. First, she asserts that the ALJ committed reversible error by failing to follow the "treating source rule" with regard to each of Plaintiff's three treating physicians, Drs. Cline, Haynes, and Plumb-Sisson. (ECF No. 7 at PAGEID ## 1290-1293.) Second, Plaintiff contends that the ALJ failed to properly evaluate the opinions from Plaintiff's examining physicians, Dr. Swedberg and Dr. Yamour. (*Id.* at PAGEID ## 1293-1294.) The Undersigned finds Plaintiff's first contention of error to be well-taken.[3]

---

[3] While Plaintiff's second assignment of error is arguably related, this finding obviates the need

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 416.927(c).[4] The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1).

The ALJ generally gives deference to the opinions of a treating source "since these are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." 20 C.F.R. § 416.927(c)(2); *Blakley*, 581 F.3d at 408. If a treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not afford controlling weight to a treating physician's opinion, then the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion

---

for in-depth analysis of Plaintiff's remaining assignment of error. Thus, the Undersigned need not, and does not, resolve the alternative basis that Plaintiff asserts supports reversal and remand. Nevertheless, on remand, the ALJ may consider Plaintiff's second assignment of error if appropriate.

[4] Plaintiff filed her claim on December 15, 2016, *see* R. at 213-219, so the rules in 20 C.F.R. § 416.927 apply. 20 C.F.R. § 416.927 ("For claims filed (see § 416.325) before March 27, 2017, the rules in this section apply.").

with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.*

Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision). Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of

your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Here, the Parties do not dispute that Drs. Cline, Haynes, and Plumb-Sisson were Plaintiff's treating physicians, nor that their opinions would be entitled to controlling weight if they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the Plaintiff's] case record . . . ." (*See* ECF No. 9 at PAGEID # 1300, citing 20 C.F.R. § 404.1527(c)(2).) After reviewing these doctors' assessments, the ALJ found that their opinions deserved only "little weight," for the following reasons:

> The undersigned affords little weight to the aforementioned statements provided by Drs. Cline and Haynes. The forms they provided contain check boxes and otherwise the doctors did not provide any additional detail with regard to claimant's conditions or resulting limitations. Moreover, since approximately December 2017, the claimant has maintained relatively benign clinical presentations, including intact range of motion, strength, sensation and motor function throughout her back and extremities. She also exhibited normal gait and coordination.
>
> Relatedly, she repeatedly admitted that medications provided adequate relief and stability in her conditions and otherwise her symptoms did not interfere with her daily functioning. It also remains that, throughout Drs. Cline and Haynes' treatment records, they never imposed limitations on her functioning; rather, they recommended that she remain active.
>
> ***
>
> The undersigned affords little weight to Dr. Plumb-Sisson's evaluation. It is clear from her Questionnaire that she could not assess most areas of claimant's functioning because it would be pure speculation on her part. In essence, the doctor did not provide much insight into claimant's functionality. Furthermore, as discussed above, the claimant's mental health issues have remained relatively stable, notwithstanding a short period of exacerbation in response to a friend's death. While the claimant has exhibited clinical evidence of depressed/anxious mood and constricted affect, she consistently maintained normal memory, attention and concentration. Overall, the doctor's report is not consistent with the record as a whole.

(R. at 17-20 (emphasis added).)  Given these findings, the ALJ was required to provide "good reasons" for discounting Drs. Cline, Haynes, and Plumb-Sisson's opinion.  20 C.F.R. § 416.927(c)(2).  The Undersigned finds that the ALJ did not do so.

First, the ALJ did not expressly conclude that Dr. Cline's opinion, Dr. Haynes' opinion, and Dr. Plumb-Sisson's opinion were not "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [were] not inconsistent with other substantial evidence in [Plaintiff's] case record" before deciding to give them only "little weight."  (R. at 17-20.)  The ALJ was obliged to adhere to this standard in declining to afford their opinions controlling weight as Plaintiff's treating physicians.  *See* 20 C.F.R. § 404.1527(c)(2) (For claims filed before March 27, 2017, "[i]f we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").

Instead, the ALJ's discussion focuses solely on the supportability and consistency of Drs. Cline, Haynes, and Plumb-Sisson's evaluations.  (R. at 17-20.)  But the ALJ's reasoning lacks sufficient specificity to comply with the "good reason" requirement.  *See* 20 C.F.R. § 416.927(c)(2); *Friend,* 375 F. App'x at 550 (noting that an ALJ's reasoning must be "sufficiently specific" as to the weight given to a treating source's medical opinion and the reasons for that weight (citing SSR 96-2p, at *5)).  As to Drs. Cline and Haynes, for example, the ALJ takes issue with the use of "check boxes" and criticizes that the doctors "did not provide any additional detail with regard to claimant's conditions or resulting limitations."  (R. at 17-18.)  The ALJ also notes that Drs. Cline and Haynes "never imposed limitations on her functioning; rather, they recommended that she remain active."  (R. at 18.)

In the Court's view, the ALJ's analysis does not satisfy the "good reason" rule required before dismissing the opinions of a treating physician, for either Dr. Cline or Dr. Haynes. As to Dr. Cline, while Dr. Cline's September 19, 2018 assessment, R. at 725-726, did incorporate "check boxes," the Court rejects the ALJ's statement that Dr. Cline "did not provide any additional detail with regard to claimant's conditions or resulting limitations." (R. at 17.) For example, the ALJ fails to mention that Dr. Cline reported that Plaintiff suffered "daily [nausea/vomiting]" and "severe constipation," and that Plaintiff had "achieved maximum medical improvement" but would continue to seek pain management. (R. at 725-726.) Also, while the ALJ did discuss Dr. Cline's assessment of Plaintiff's functional limitation, the ALJ failed to mention that Dr. Cline also indicated that he did not expect Plaintiff's condition to improve in the future. (*Id.*) These facts present a far different narrative than that set forth by the ALJ.

Likewise, as to Dr. Haynes' opinion, the Court disagrees with the ALJ's statement that Dr. Haynes "never imposed limitations on [Plaintiff's] functioning; rather, [Dr. Haynes] recommended that she remain active." (R. at 17.) This statement is directly at odds with a piece of evidence that the ALJ did cite, which was that in March 2017, Dr. Haynes prescribed Plaintiff with a five-year handicap parking placard, noting that Plaintiff could not walk more than fifty feet without stopping due to her "chronic condition." (R. at 577.) Separately, and perhaps more importantly, the ALJ's discussion of Dr. Haynes' opinion is irretrievably tainted by the ALJ's description of Plaintiff's March 22, 2017 examination:

> Further, the claimant complained of tingling in her bilateral hands. Clinically, **Dr. Haynes** found evidence of poor grip and slow, halting gait. She satisfied the claimant's request for a handicap parking placard. Additionally, she filled out a form titled "Examination for Household Status or Permanent Need for Regular Aid and Attendance", in which she stated that claimant could feed herself, manage finances, administer her medications, and sometimes complete personal care. However, she

needed assistance with preparing meals, bathing, and tending to her personal care. She also set forth that claimant had difficulty with ambulation and other limits secondary to tingling in her hands. Interestingly, she specifically noted that claimant did not require the use of an assistive device. (Exhibits 10F/1-3 and 11F/23-26).

(R. at 16-17 (emphasis added).) The ALJ attributed all of the above to Dr. Haynes, but it was in fact another VA doctor, Dr. Karen Hill, who examined Plaintiff on March 22, 2017, and it was Dr. Hill – not Dr. Haynes – who authored the Examination for Household Status or Permanent Need for Regular Aid and Attendance form. (R. at 578-579.) Dr. Hill was not Plaintiff's treating physician, and the ALJ improperly conflated Dr. Hill's examination with Dr. Hayne's opinion. Accordingly, the Court rejects the ALJ's statement that Dr. Haynes "never imposed limitations on [Plaintiff's] functioning" and "recommended that she remain active." (R. at 17.)

Finally, as to Dr. Plumb-Sisson, the ALJ latches onto three statements in Dr. Plumb-Sisson's five-page assessment to conclude that "[i]t is clear . . . that [Dr. Plumb-Sisson] could not assess most areas of claimant's functioning because it would be pure speculation on her part." (R. at 20.) Although Dr. Plumb-Sisson did respond that it "would be speculation" for her to assess Plaintiff's functional ability for certain work-related activities, *see* R. at 1241-1242, the ALJ completely overlooks the rest of Dr. Plumb-Sisson's evaluation. At the end of the evaluation, for example, Dr. Plumb-Sisson clarifies her "speculation" comment, explaining that Plaintiff would need to see a physician "for [Plaintiff's] full limitations, as [Dr. Plumb-Sisson] can only attest to [her] own observations/experiences with [Plaintiff]." (R. at 1243.) This statement confirms that Dr. Plumb-Sisson's assessment *does* provide Dr. Plumb-Sisson's opinion, as Plaintiff's treating psychologist, as to Plaintiff's functional ability.

To that end, a closer look at Dr. Plumb-Sisson's assessment finds that Dr. Plumb-Sisson did evaluate Plaintiff's ability, despite the ALJ's claim to the contrary. Specifically, Dr. Plumb-

Sisson found that Plaintiff's psychiatric condition "exacerbate[s]" Plaintiff's experience of pain or other physical symptoms, noting that Plaintiff's stomach bloats or cramps "with pain comparable to labor," and that she gets chest pain, headaches, lower back pain, and tension pain at the base of her spine. (R. at 1240.) While the ALJ did list Plaintiff's various "extreme limit[ations]" and "interfere[ences]," she conspicuously avoided Dr. Plumb-Sisson's conclusion:

> [Plaintiff's] pain and unpredictable voiding of bowels interferes with her ability to work. Her pain and emotional distress often make it a challenge for her to concentrate and retain information. Veteran cannot sit for extended periods of time (45-60 mins), nor can she stand on her feet.

(R. at 1243.)

Indeed, the ALJ ignored much of Dr. Plumb-Sisson's opinion, which then allowed her to conclude that Dr. Plumb-Sisson "did not provide much insight into [Plaintiff's] functionality." (R. at 20.) The Court disagrees with this assessment, and finds that it does not satisfy the good reason rule required to explain the "little weight" given to Dr. Plumb-Sisson's opinion as a treating source opinion. 20 C.F.R. 416.927(d)(2). For example, had the ALJ examined Dr. Plumb-Sisson's discussion of how Plaintiff's psychiatric condition "exacerbate[s]" her physical symptoms, which "make it a challenge for her to concentrate and retain information" and that Plaintiff can only sit or stand for 45-60 minutes, then the ALJ would have observed that these opinions were consistent with the other substantial evidence in the record. (*See, e.g.,* R. at 76-77 (Plaintiff's testimony that her condition limits her ability to walk or sit), R. at 726 (Dr. Cline's opinion that Plaintiff can only sit or stand for up to an hour), R. at 842 (Plaintiff's statement that she needed to "get my emotions under control so my physical stuff doesn't start up.").)

Separately, Dr. Plumb-Sisson also found that Plaintiff's medications have several detrimental side effects, including dizziness, nausea, swelling (of Plaintiff's hands, feet, and face), diarrhea, headaches, "mental fog," muscle spasms, forgetfulness, and difficulties

concentrating. (R. at 1240.) The Court also finds that each of these symptoms is supported by substantial evidence in the record, contrary to the ALJ's unsupported statement that Plaintiff "consistently maintained normal memory, attention and concentration." (R. at 20.)

Simply put, the ALJ's conclusory explanations for discounting Drs. Cline, Haynes, and Plumb-Sisson's opinions do not meet the standard of providing "good reasons" for discounting a treating physician opinion under 20 C.F.R. § 416.927(c)(2):

> Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. [*Blakley*, 581 F.3d at 408.] Put simply, it is not enough to dismiss a treating physician's opinion as "incompatible" with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.

*Friend*, 375 F. App'x at 552. The Undersigned further concludes, however, that the ALJ's failure to give good reasons for rejecting the opinions of Drs. Cline, Haynes, and Plumb-Sisson does not constitute *de minimis* or harmless error. *Wilson*, 378 F.3d at 547. *De minimis* or harmless error occurs: (1) if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of the procedural safeguard of the good reasons rule even though an ALJ has not complied with the express terms of the regulation. *Id.* With respect to the last exception, the treating source rule's procedural protections "may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments." *Friend*, 375 F.App'x at 551 (emphasis omitted).

None of these circumstances exist here. First, Drs. Cline, Haynes, or Plumb-Sisson's opinions cannot be "so patently deficient" that the Commissioner could not possibly credit it. The Undersigned notes that neither the Commissioner nor the ALJ has ever asserted as such, but perhaps more importantly, the ALJ assigned "little weight" – not no weight – to their assessments. *See Robinson v. Comm'r of Soc. Sec.*, No. 2:14-CV-01682, 2015 WL 5768483, at *6 (S.D. Ohio Sept. 30, 2015). As to the second exception, the Commissioner did not adopt any of Drs. Cline, Haynes, or Plumb-Sisson's opinions or make similar findings. *Id.* Finally, although the ALJ does attempt to attack the consistency and supportability of Drs. Cline, Haynes, or Plumb-Sisson's opinions, the ALJ's explanations, as discussed above, are not sufficient to otherwise meet the goals of the good reason requirement. *Id.*

In sum, the ALJ did not consider the proper factors when she determined the weight that Drs. Cline, Haynes, or Plumb-Sisson's opinions would receive. The ALJ provided several reasons for her decision, but those reasons lack sufficient specificity to comply with the good reason requirement and are not supported by the record. Even assuming, *arguendo*, that ALJ had provided good reasons to discount one or two of Plaintiff's three treating source opinions, remand still would be appropriate for her failure to provide good reasons for discounting all of Plaintiff's treating source opinions. That is not the case, however, as the ALJ failed to provide good reasons for discounting *any* of Plaintiff's treating source opinions, and these were not harmless errors.

For these reasons, it is **RECOMMENDED** that Plaintiff's first contention of error be **SUSTAINED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence does not support the ALJ's decision denying benefits.  Based on the foregoing, it is therefore **RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that this action be **REMANDED** under Sentence Four of § 405(g).

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date: June 28, 2021                          /s/ *Elizabeth A. Preston Deavers*
                                             **ELIZABETH A. PRESTON DEAVERS**
                                             **UNITED STATES MAGISTRATE JUDGE**